**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COREY SPARKS,<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC., *et al.*,<br><br>Defendants. | Civil Action No. 25-630 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Teva Pharmaceuticals USA, Inc. ("Teva") and Anda, Inc.'s ("Anda" and collectively with Teva, "Defendants") Motion for Summary Judgment. (ECF No. 24.) Plaintiff Corey Sparks ("Plaintiff") opposed (ECF No. 27), and Defendants replied (ECF No. 28). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons below, Defendants' Motion for Summary Judgment is granted.

## I. BACKGROUND

The following facts are drawn from the Statement of Undisputed Material Facts ("SOF") (SOF, ECF No. 24-3), Response to the Statement of Undisputed Material Facts ("RSOF") (RSOF, ECF No. 27-4), Counterstatement of Material Facts ("COF") (COF, ECF No. 27-3), and Response to the Counterstatement of Material Facts ("RCOF") (RCOF, ECF No. 28-1) and are undisputed by the parties unless otherwise noted.

### A. Factual Background

Plaintiff began working with Teva as Vice President, Finance and Controller, North America, in March 2019. (SOF ¶ 1; RSOF ¶ 1.) Plaintiff's signed offer letter stated that "[t]he nature of your employment with us is and will be 'at will,' as defined by applicable law . . . ." (SOF ¶ 2; RSOF ¶ 2.) Plaintiff was later promoted to Vice President, Regional Finance Director, U.S. in 2021. (SOF ¶ 7; RSOF ¶ 7.)

On November 15, 2022, Plaintiff "attended the Healthcare Distribution Alliance ("HDA") [c]onference at the Mayflower Hotel in Washington, D.C. (the "HDA Conference") and sat at the Teva-sponsored table during the event." (SOF ¶ 9; RSOF ¶ 9; COF ¶ 7; RCOF ¶ 7.) Anda had its own table at the conference which was at the other end of "a big ballroom[.]" (SOF ¶¶ 19-20; RSOF ¶¶ 19-20.) During the event, Plaintiff did not go to the Anda table and Mark Dudick ("Dudick"), a Senior Director, Account Manager, at Anda, which is a wholly owned subsidiary of Teva, did not come to see [Plaintiff] at the Teva table." (SOF ¶¶ 12, 21; RSOF ¶¶ 12, 21.) During such industry events there is a lot of drinking, and "everybody at the table . . . get[s] poured . . . glasses of wine." (SOF ¶ 10; RSOF ¶ 10.) That night, there was a "cocktail hour leading up to the event beginning around 6:00 p.m." and the main event began "around 7:00 p.m. and last[ed] until around 9:00 p.m." (SOF ¶ 11; RSOF ¶ 11; *see* COF ¶ 12; RCOF ¶ 12.)

After the conference concluded, Plaintiff "walked out to the lobby and spoke with . . . Dudick." (SOF ¶ 12; RSOF ¶ 12.) Plaintiff and Dudick had only met once before in October 2022 and had not seen each other since then until the morning of the conference. (SOF ¶¶ 15-16; RSOF ¶¶ 15-16.) Plaintiff and Dudick, thereafter, left the hotel and were joined by Paige Wilson ("Wilson"), Associate Director, Account Management, at Anda, and Dudick's subordinate, in a

taxicab or Uber to "Post Pub," where Plaintiff and Dudick had eaten lunch earlier that day. (SOF ¶¶ 13, 23; RSOF ¶¶ 13, 23.)

Plaintiff sat up front in the car and Wilson and Dudick sat in the back. (SOF ¶ 24; RSOF ¶ 24.) While Plaintiff denies the truth of the allegations, Dudick and Wilson both testified that "when the driver made a wrong turn . . . [Plaintiff] made increasingly aggressive comments, including [saying] that he owned a gun, knew [t]aekwando, and would put the driver face down on the pavement." (SOF ¶ 25 (first citing Ex. 7 to Defs.' Mot. for Summary J. ("Dudick Dep.") 49:5-10, 50:3-13, 50:23-51:8, ECF No. 24-13; and then citing Ex. 8 to Defs.' Mot. for Summary J. ("Wilson Dep.") 57:19-58:3, 59:5-12, 62:15-21, ECF No. 24-14; *but see* RSOF ¶ 25 ("Denied.").) "Upon arriving at Post Pub around 9:30 p.m., [Plaintiff], Dudick, and Wilson each ordered a beer and only stayed for [fifteen] to [twenty] minutes because the bartender announced they were closing for the evening." (SOF ¶ 27; RSOF ¶ 27.) While Plaintiff denies the truth of the allegations, Dudick and Wilson testified that Plaintiff had an "escalating" conversation with the bartender. (SOF ¶¶ 28-29 (first citing Dudick Dep. 53:8-54-9, 54:10-16; and then citing Wilson Dep. 68:5-25); *but see* RSOF ¶¶ 28-29 ("Denied.").) Plaintiff, "Dudick, and Wilson then went to [a nearby establishment, 'Stan's'], . . . and sat at the end of the bar in the corner." (SOF ¶ 31; RSOF ¶ 31; COF ¶ 23; RCOF ¶ 23.) Plaintiff "sat next to Wilson, in the middle, and Dudick sat next to [Plaintiff] on the other side." (SOF ¶ 33; RSOF ¶ 33.) Plaintiff, "Dudick, and Wilson each ordered mixed drinks." (SOF ¶ 34; RSOF ¶ 34.) Wilson noted "that every mixed drink was 'at least' the equivalent of a 'double.'" (SOF ¶ 37; RSOF ¶ 37.)

While Plaintiff denies the truth of the allegations: (1) Dudick and Wilson both testified that Plaintiff was becoming increasingly intoxicated (SOF ¶¶ 40-43; RSOF ¶¶ 40-43 (admitting that the representation of the testimony was accurate but explaining the paragraphs are "[d]enied as to

the[ir] truth and substance")); (2) Wilson testified that Plaintiff told her that she was "so cute" (SOF ¶¶ 42, 46; RSOF ¶¶ 42, 46 (admitting that the representation of the testimony was accurate but explaining the paragraphs are "[d]enied as to the[ir] truth and substance")); (3) Dudick testified that "[t]here was a point where I heard the word cute and then [Wilson] asked [Plaintiff] to tell [me] what [Plaintiff] just said and then [Plaintiff] said that [I] was cute too, so ha ha" (SOF ¶ 47; RSOF ¶ 47 (admitting that the representation of the testimony was accurate but explaining the paragraphs are "[d]enied as to the[ir] substance")); (4) Dudick and Wilson both testified that due to Plaintiff's intoxication, the "bartender said [Plaintiff] would not be allowed to exit up the stairs and needed to take the elevator" (SOF ¶ 50; RSOF ¶ 50 ("Denied")); and (5) Dudick and Wilson both testified that Wilson had to use Plaintiff's phone to call him an Uber because he had trouble doing so due to his intoxication (SOF ¶ 51); *but see* RSOF ¶ 51 ("Denied.")). When they left, Plaintiff took the Uber separately to his hotel because he was staying at a different hotel than Dudick and Wilson. (SOF ¶ 52; RSOF ¶ 52; *see* COF ¶ 33; RCOF ¶ 33.)

Dudick and Wilson walked back to their hotel. (SOF ¶ 56; RSOF ¶ 56.) The next morning, in the hotel lobby, Dudick and Wilson discussed the matter further when they met for breakfast. (SOF ¶ 61; RSOF ¶ 61.) Later that day, "Wilson sent Dudick a text message stating that she wanted to report the events from the prior evening to Dudick's supervisor, [Selena Reyes ('Reyes')], Anda Vice President, Sales and Marketing." (SOF ¶ 64; RSOF ¶ 64.) "Dudick then called Reyes to report that Wilson wanted to lodge a complaint, along with his recollection of the events in question." (SOF ¶ 65; RSOF ¶ 65.) Dudick and Wilson thereafter had a conversation with Reyes before providing written summaries of what transpired to Sandra Nelson ("Nelson"), Anda's Director, Human Resources, as requested by Reyes. (*See* SOF ¶¶ 66-69; RSOF ¶¶ 66-69.) Dudick and

Wilson recall having no further involvement in the complaint investigation process after they prepared and submitted their written summaries. (SOF ¶ 72; RSOF ¶ 72.)

Nelson forwarded Reyes's summary of the conversation with Dudick and Wilson to Carlos Benitez ("Benitez"), Teva's Senior Director, United States People and Program Management Office, who was employed by Teva's affiliate Teva Sales Marketing, Inc. ("TSM"), and Plaintiff's HR Business Partner, later that same day. (SOF ¶ 74; RSOF ¶ 74.) Benitez understood that Wilson complained about Plaintiff because "she was concerned about some behaviors that she had witnessed and experiences she had." (SOF ¶ 75; RSOF ¶ 75.) Specifically, Wilson was concerned that "[t]here were allegations of threats of violence against another person, there were allegations of unwanted touching, there were allegations of expressions that were deemed to create a hostile work environment, and there were also allegations that seemed to talk about improper use of alcohol." (SOF ¶ 75; RSOF ¶ 75.)

Benitez also explained that there was:

> a statement that . . . was written by . . . Wilson, where she describes the events of the night where she has her difficult moment with [Plaintiff]. There is a document from [Dudick] that confirms that he was present, and there were certain circumstances that were uncomfortable. There is a note from . . . Reyes describing where she[] [i]s writing her notes and documenting the conversation she had with . . . Wilson. [Wilson] was again confirming this, and I remember at the end of that document, . . . Dudick is quot[ed] as saying, ["]Yes, . . . that's aligned to what we had discussed before.["]

(SOF ¶ 76 (quoting Ex. 6 to Defs.' Mot. for Summary J. ("Benitez Dep.") 61:15-62:2); RSOF ¶ 76.) Based on Wilson's complaint against Plaintiff, a report was made to the Office of Business Integrity ("OBI"), which is shared by both Teva and Anda. (SOF ¶ 79; RSOF ¶ 79.) The OBI complaint, which was opened on or about November 17, 2022, was categorized as "raising issues

of discrimination or harassment, substance abuse, and offensive or inappropriate communications." (SOF ¶ 79; RSOF ¶ 79.)

Benitez was the lead investigator in connection with the OBI complaint. (SOF ¶ 81; RSOF ¶ 81.) Benitez started the investigation by "reviewing all the statements that had been provided" before having a "conversation with . . . Reyes[,]" another conversation with Teva's Senior Director of the OBI, who had "received the official report[,] . . . and then having [an additional] conversation with [his] supervisor Dan Lawlor [("Lawlor")]." (SOF ¶ 81 (citing Benitez Dep. 36:4-15, 36:19-23, 67:15-22, 68:6-11); RSOF ¶ 81.) Benitez did not speak to Wilson personally but did speak with Plaintiff. (SOF ¶¶ 82-83; RSOF ¶¶ 82-83.) Based on Benitez's discussion with Plaintiff, Benitez believed that Plaintiff's account of the events in question was not credible. (SOF ¶ 92; RSOF ¶ 92.) Benitez, conversely, trusted the assessments of Reyes and Nelson regarding the credibility of the accounts of Wilson and Dudick. (*Id.*) Benitez thereafter spoke with Lawlor to determine "what would be the adequate next steps to take." (SOF ¶ 93; RSOF ¶ 93.) Benitez and Lawlor concluded that termination was appropriate because Wilson's complaint constituted "the fourth allegation and report of [Plaintiff] creating a hostile work environment while employed at Teva, in reference to three prior OBI complaints initiated against [Plaintiff]." (SOF ¶ 94 (citation modified); RSOF ¶ 94 ("Admit as to the existence of four prior OBI complaints[.]"); *see also* SOF ¶¶ 95-97 (describing the three previous OBI complaints); RSOF ¶¶ 95-97 (admitting that the reports were made).) Lawlor ultimately made the decision to terminate Plaintiff's employment with Teva. (SOF ¶ 98; RSOF ¶ 98.) Plaintiff was terminated from employment with Teva on December 5, 2022. (SOF ¶ 100; RSOF ¶ 100; COF ¶ 42; RCOF ¶ 42.)

When Plaintiff was terminated, Teva had in place a Separation Benefits Plan (the "Plan") dated April 1, 2020. (SOF ¶ 111; RSOF ¶ 111.) Teva administers and funds the Plan from its general

assets. (SOF ¶¶ 112-13; RSOF ¶¶ 112-13.) The Plan provides that non-union employees "separated from employment for misconduct, violation of company policies, procedures, practices or Ethics and Code of Conduct are ineligible to receive Plan benefits." (SOF ¶ 114 (quoting Ex. 23 to Defs.' Mot. for Summary J. (the "Plan") (citation modified)); RSOF ¶ 114.) Pursuant to the Plan, exhaustion of the Plan's administrative remedies is a prerequisite to filing a civil lawsuit contesting a Plan Administrator's[1] determination. (SOF ¶ 119; RSOF ¶ 119.)

**B. Procedural Background**

Plaintiff initially filed a complaint in the Superior Court of New Jersey, Law Division, Hunterdon County asserting eight counts against Defendants. Plaintiff thereafter filed a Second Amended Complaint, which was removed to this Court by Defendants. (Notice of Removal, ECF No. 1.) Plaintiff subsequently filed the operative Third Amended Complaint (the "TAC") asserting ten counts against Defendants: (1) violation of New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. 10:5-1 *et. seq.* ("Count One"); (2) breach of an employment contract ("Count Two"); (3) breach of the implied covenant of good faith and fair dealing ("Count Three"); (4) declaratory judgment ("Count Four")[2]; (5) violation of the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. 34:19-1 *et seq.* ("Count Five"); (6) tortious interference with business relations ("Count Six"); (7) breach of an employment contract ("Count Seven"); (8) negligence ("Count Eight"); (9) piercing the corporate veil/alter ego liability ("Count Nine"); and (10) violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

[1] The Plan Administrator here was Lawlor. (*See* SOF ¶ 118 (naming Lawlor as Plan Administrator); RSOF ¶ 118 (explicitly denying other facts but not denying that Lawlor was the Plan Administrator).)

[2] Counts Four, Five, and Six of the TAC, however, "remain dismissed without prejudice pursuant[] to" a state court order, and were "included [in the TAC] for reference only[.]" (Joint Stipulation and Order, ECF No. 14.)

§ 1132(a)(1)(B) ("Count Ten"). (TAC ¶¶ 41-92, ECF No. 12.) Defendants filed an Answer and Affirmative Defenses. (Answer, ECF No. 15.) Defendants then filed the instant motion seeking summary judgment in their favor on all of Plaintiff's remaining claims, which include Counts One through Three and Seven through Ten. (Defs.' Mot. for Summary J., ECF No. 24.) Plaintiff opposed (Pl.'s Opp'n Br., ECF No. 27), and Defendants replied (Defs.' Reply Br., ECF No. 28).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a summary judgment motion, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the

nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . 'there can be no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-50. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III. DISCUSSION

Defendants move for summary judgment on all of Plaintiff's remaining claims which include Counts One through Three and Seven through Ten. (*See generally* Defs.' Moving Br., ECF No. 24-4.) The Court considers each of Defendants' arguments in turn.[3]

### A. Plaintiff's NJLAD Discrimination Claim—Count One

Defendants argue that they are entitled to summary judgment on Plaintiff's gender discrimination claim brought under the NJLAD. (Defs.' Moving Br. 14-31.)

[3] For the sake of efficiency, the Court will address the claims as to both Defendants but notes that if it dismisses Plaintiff's piercing the corporate veil/alter ego liability claim (Count Nine) which it addresses later, its analysis of Plaintiff's other claims will apply only to Teva.

Discrimination claims brought under the NJLAD are "controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas.*" *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (citing, among others, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).[4] The *McDonnell Douglas* framework requires that the plaintiff first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802-04. If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's nondiscriminatory explanation is merely a pretext for the discrimination. *Id.* In the context of a summary judgment challenge, at the pretext stage of *McDonnell Douglas*, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either[:] (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (internal quotation marks omitted). To accomplish this, a plaintiff must "demonstrate

---

[4] Both parties focus much of their briefing on New Jersey's modified, heightened pleading standard for reverse discrimination claims, which requires "background circumstances" to "support the suspicion that the defendant is the unusual employer who discriminates against the majority" as articulated in *Erickson v. Marsh and McLennan Co. Inc.*, 569 A.2d 793 (N.J. 1990). The Third Circuit, however, recently predicted that in light of the United States Supreme Court's decision in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), the Supreme Court of New Jersey would strike down the "Background Circumstances Rule" in the same way that the *Ames* Court did. *Massey v. Borough of Bergenfield*, 169 F.4th 188, 196-97 (3d Cir. 2026). The Third Circuit therefore set aside the Background Circumstances Rule and analyzed the plaintiff's reverse discrimination NJLAD claim under the traditional *McDonnell Douglas* test. *Id.* This Court, bound by Third Circuit precedent, will follow the Third Circuit's guidance and analyze Plaintiff's claims pursuant to the *McDonnell Douglas* test, absent the Background Circumstances Rule. *Bengal Converting Servs., Inc. v. Landmark Am. Ins. Co.*, No. 24-3332, 2025 WL 720087, at *9 (E.D. Pa. Mar. 5, 2025) ("[T]his Court is bound by the decision[s] of the Third Circuit.").

such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Tourtellotte*, 636 F. App'x at 842 (alteration in original) (internal quotations and citations omitted).

Plaintiff alleges that Defendants "wrongfully terminated" him on account of his gender. (TAC ¶¶ 42-44.) To establish a prima facie case of discriminatory discharge under the NJLAD, a plaintiff must show that: (1) he is a member of a protected class; (2) he was "otherwise qualified and performing the essential functions of the job; (3) . . . [he] was terminated; and (4) . . . the employer thereafter sought similarly qualified individuals for that job." *Crisitello v. St. Theresa Sch.*, 299 A.3d 781, 799-800 (N.J. 2023) (Pierre-Louis, J., concurring) (quoting *Smith v. Millville Rescue Squad*, 139 A.3d 1, 14 (N.J. 2016)).

Here, there is no dispute that Plaintiff, as a man, is a member of a protected class. *See Elghandour v. Marina Dist. Dev. Co., LLC*, No. A-4455-16T3, 2018 WL 5831308, at *3 (N.J. Super. Ct. App. Div. Nov. 8, 2018) ("The [NJ]LAD prohibits employers from discriminating against employees based upon their gender." (citing N.J. Stat. Ann. 10:5-12(a))). Defendants, moreover, do not argue that Plaintiff was not qualified. (*See generally* Defs.' Moving Br.) It is further undisputed that Plaintiff was terminated. (SOF ¶ 100; RSOF ¶ 100.) The question of whether Plaintiff has met the prima facie showing therefore turns on whether Defendants sought similarly qualified individuals for the job after Plaintiff was terminated. *See Crisitello*, 299 A.3d at 800. Plaintiff, however, has pointed to no facts in the record to establish the remaining element and argues that "the question [of] whether Teva sought similarly qualified individuals for his role or redistributed his responsibilities in a way that favored [women] [] is factual and cannot be

resolved . . . in Teva's favor" because "Plaintiff was not privy to this sort of information as he was not a member of the Human Resources department[.]" (Pl.'s Opp'n Br. 9.) This argument highlights Plaintiff's failure to meet his burden because he has not pointed to any evidence in the record—and the Court's review of the record has not revealed any evidence—to show that Teva sought *any* individuals to fill his role, let alone individuals that were similarly qualified. (*See generally* COF; RCOF; SOF; RSOF); *see also Pizzo v. Lindenwold Bd. of Educ.*, No. 13-3633, 2015 WL 1471943, at *10 (D.N.J. Mar. 31, 2015) (granting defendant's summary judgment motion on plaintiff's discriminatory discharge claim where, among other things, plaintiff "ha[d] not set forth any evidence . . . in the record[,] nor even argued that [d]efendant sought a similarly qualified individual for the job after [p]laintiff was fired"); *McDaniel v. Borough of N. Caldwell*, No. 05-5865, 2007 WL 4571100, at *4 (D.N.J. Dec. 27, 2007) (granting defendant's summary judgment motion on plaintiff's Title VII claim where, among other things, "there exist[ed] no evidence . . . demonstrating . . . that [the defendant] sought to fill [plaintiff's] position by hiring an individual with similar qualifications"). There is, accordingly, no dispute that Plaintiff has failed to meet his burden of establishing a prima facie case of discriminatory discharge. *See Davis v. Phelan Hallinan & Diamond, PC.*, No. 15-3621, 2016 WL 1078166, at *2 (D.N.J. Mar. 18, 2016) ("If the nonmoving party fails to make a sufficient showing on any essential element of its case, the moving party is entitled to judgment as a matter of law." (citing *Celotex*, 477 U.S. at 323)), *aff'd sub nom.*, *Davis v. Phelan Hallinan & Diamond PC*, 687 F. App'x 140 (3d Cir. 2017).

The Court therefore dismisses Count One of the TAC.

**B. Common Law Claims—Counts Two, Three, Seven, and Eight**

Defendants argue that they are entitled to Summary Judgment on Plaintiff's remaining common law claims because they are duplicative of and therefore preempted by his NJLAD claim.

(Defs.' Moving Br. 40-42.) New Jersey courts have routinely ruled that the NJLAD preempts common law claims "that are[:] (1) based on the same factual predicates[;] and (2) seek the same relief as a plaintiff's NJLAD claim." *Belfort v. Morgan Props., LLC*, No. 16-5207, 2018 WL 3201787, at *10 (D.N.J. June 29, 2018) (collecting cases); *see also Blount v. TD Bank, N.A.*, No. 20-18805, 2023 WL 4621881, at *16 (D.N.J. July 19, 2023) (ruling NJLAD preempted plaintiff's intentional infliction of emotional distress claim "that [was] premised on the same conduct that serves as the basis of her NJLAD claims"). Plaintiff here bases his breach of contract (Counts Two and Seven), breach of the implied covenant of good faith and fair dealing (Count Three), and negligence (Count Eight) claims on the same factual allegations that form his NJLAD claim, and he seeks the same relief for all four claims. (*See* TAC ¶ 49 (Count Two alleging that "Defendants . . . breached the terms of th[e] contract by . . . discharging Plaintiff for unlawful and discriminatory reasons"); *id.* ¶ 53 (Count Three alleging that "[b]y *the conduct alleged herein*, Defendants have breached the duty of good[] faith and fair dealing" (emphasis added)); *id.* ¶ 73 (Count Seven alleging that Defendants' breach resulted in Plaintiff's "wrongful termination"); *id.* ¶ 76 (Count Eight alleging that Defendants "owed a duty to avoid causing Plaintiff harm or otherwise engaging in *the conduct alleged herein*" (emphasis added)); *see also id.* (Counts Two, Three, Seven, and Eight Wherefore Cls.).) "Because Plaintiff[] ha[s] merely repackaged [his] NJLAD claim into [common law claims here], the NJLAD preempts the [common law] claim[s]." *Addison v. Signet Jewelers Ltd.*, No. 23-22956, 2025 WL 1766119, at *9 (D.N.J. June 26, 2025) (granting summary judgment on an intentional infliction of emotional distress claim where, among other things, plaintiffs based the common law claim "on the same [factual] allegations that form[ed] their NJLAD claim" and sought "the same relief for both claims").

Even if Plaintiff's common law claims were not preempted by the NJLAD, however, Defendants are entitled to summary judgment on the merits.

### *1. Breach of Contract—Counts Two and Seven*[5]

To establish a claim for breach of contract, a plaintiff must prove that: (1) "the parties entered into a contract containing certain terms;" (2) "plaintiff[] did what the contract required [him] to do;" (3) "defendants did not do what the contract required them to do[;]" and (4) "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiff[]." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (internal quotation marks and citation omitted).

In New Jersey, however, "[e]mployment is presumed to be 'at-will[.]'" *Pickholz v. TransparentBusiness, Inc.*, No. 22-2504, 2024 WL 489543, at *8 (D.N.J. Feb. 8, 2024) (citing *Varrallo v. Hammond Inc.*, 94 F.3d 842, 845 (3d Cir. 1996)). "While exceptions to this doctrine do exist, today, both employers and employees commonly and reasonably expect employment to be at-will, unless specifically stated in explicit, contractual terms." *Id.* (citation modified). "[T]o overcome this presumption," therefore, "a plaintiff must demonstrate that there was an agreement to contract to something other than at-will employment—for example, that the parties had agreed to contract for a term of years, that employment would be 'for-cause,' or that employment is subject to tenure." *Id.* (citation omitted). "Such an agreement can be made through an explicit provision in an employment contract or through an implied contract." *Id.* (citing *McCrone v. Acme Markets*, 561 F. App'x 169, 172-73 (3d Cir. 2014) (collecting cases and explaining that the New Jersey Supreme Court has found that a company-wide policy of for-cause employment provided in

[5] Count Two alleges that Plaintiff and Defendants "entered into a binding employment contract" (TAC ¶ 47) while Count Seven alleges that "Plaintiff had a contract of employment with Defendants and the board on which he served" (TAC ¶ 71).

employment manuals or oral communications can overcome the presumption of at-will employment). "In the absence of a clear disclaimer of at-will status in a contract, courts consider extrinsic evidence to determine whether at-will status has been revoked." *Id.* (citation omitted).

Here, it is undisputed that Plaintiff's signed offer letter states explicitly that he was an at-will employee. (SOF ¶ 2 ("The nature of your employment with us is and will be 'at will,' as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability." (quoting Ex. 5 to Defs.' Mot. for Summary J. P-2 ("Offer Letter"), ECF No. 24-11); RSOF ¶ 2 ("Admit that the signed offer letter between Plaintiff and Teva, and the excerpted language, speaks for itself.").) In opposition, Plaintiff argues that "Teva had policies and procedures in place for conducting investigations" as well as "a policy governing the use of alcohol." (Pl.'s Opp'n Br. 14.) Plaintiff contends that it is a question of fact whether such "policies . . . form part of an enforceable employment contract." (*Id.*) Contrary to Plaintiff's assertions, the policies that Plaintiff references contain no reference to a company-wide policy of for-cause employment or anything else that would transform Plaintiff's employment from the clear description of "at-will" employment contained in his signed offer letter. (*See* Teva's Code of Conduct, ECF No. 24-11.) Plaintiff, moreover, has failed to point to any evidence in the record expressing a clear revocation of, or change to Plaintiff's at-will employment status. (*See generally* Pl.'s Opp'n Br.; COF.) "Courts have consistently held that . . . clear at-will employment language prevents any implicit conditions of employment from forming the basis of a contract claim under New Jersey law." *Lee v. United Airlines, Inc.*, No. 18-14772, 2021 WL 2679891, at *5 (D.N.J. June 29, 2021).

Because it is undisputed that Plaintiff executed the offer letter which clearly indicated that his employment was at-will, Plaintiff has "failed to meet his burden of establishing that an enforceable contract exists between the parties." *Lee*, 2021 WL 2679891, at *5-6 (granting employer defendant summary judgment on plaintiff's breach of contract claim where plaintiff signed an offer letter indicating that her employment was at will).

The Court therefore dismisses Counts Two and Seven of the TAC.

### 2. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

In New Jersey, "[a]n implied covenant of good faith and fair dealing exists in every contract[.]" *Bricks Flower Mkt., LLC v. Brick Flower Mkt., LLC*, No. A-3533-23, 2026 WL 1162734, at *9 (N.J. Super. Ct. App. Div. Apr. 29, 2026) (citing *Wood v. New Jersey Mfrs. Ins. Co.*, 21 A.3d 1131, 1140 (N.J. 2011)). That implied covenant "requires parties to a contract to 'refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.'" *Roche v. Aetna, Inc.*, No. A-76-21, 2023 WL 8231738, at *4 (N.J. Super. Ct. App. Div. Nov. 28, 2023) (internal quotation marks omitted) (quoting *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005)). "A party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith had engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *Bricks*, 2026 WL 1162734, at *9 (citation modified) (quoting *Brunswick Hills Racquet Club*, 864 A.2d at 396). "In the absence of a contract, [however,] there can be no breach of an implied covenant of good faith and fair dealing." *Roche*, 2023 WL 8231738, at *4 (quoting *Noye v. Hoffmann-La Roche Inc.*, 570 A.2d 12, 14 (N.J. Super. Ct. App. Div. 1990)).

Here, Plaintiff argues in opposition that "Teva acted in bad faith by seizing on an unproven allegation, ignoring its own investigative duties, and terminating [Plaintiff] to avoid paying bonuses and stock options . . . already earned[,]" which he argues "are factual assertions of bad faith and improper motive that preclude summary judgment." (Pl.'s Opp'n Br. 15.) Because Plaintiff fails to cite *anything* or produce any concrete evidence to support such a proposition, this Court does not agree. *See Morgan v. Sunoco Logistics Partners GP LLC*, No. 25-2372, 2026 WL 710003, at *9 (E.D. Pa. Mar. 12, 2026) (explaining that "unsupported assertions, speculation, or conclusory allegations cannot defeat summary judgment" (citing *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d Cir. 2003)).

It is undisputed, moreover, that Benitez: (1) reviewed Wilson's statement describing the night at the HDA Conference (SOF ¶¶ 76, 81; RSOF ¶¶ 76, 81); (2) reviewed Dudick's statement "confirm[ing] that he was present, and there were certain circumstances that were uncomfortable" (*Id.*); (3) reviewed Reyes's notes "documenting the conversation she had with . . . Wilson[,]" and Dudick confirming that the notes were aligned with what they had discussed before (*Id.*); (4) spoke with Reyes (SOF ¶ 81; RSOF ¶ 81); (5) spoke with Teva's Senior Director of the OBI (SOF ¶ 81; RSOF ¶ 81); (6) spoke with Lawlor (*Id.*); (7) spoke with Plaintiff and determined that Plaintiff's account of the events was not credible, but trusted the assessments of Reyes and Nelson regarding the credibility of the accounts of Wilson and Dudick (SOF ¶ 92; RSOF ¶ 92); and (8) knew that this incident constituted the fourth OBI complaint initiated against Plaintiff (SOF ¶ 94; RSOF ¶ 94). These undisputed facts show that an investigation did, in fact, take place.

Furthermore, under New Jersey law, "there is no covenant of good faith and fair dealing between an employer and an 'at-will' employee." *Marrin v. Cap. Health Sys., Inc.*, No. 14-2558, 2015 WL 404783, at *5 (D.N.J. Jan. 29, 2015) (citation omitted). As discussed above, it is

undisputed that Plaintiff's signed offer letter explicitly states that Plaintiff was an at-will employee. (SOF ¶ 2; RSOF ¶ 2.) Therefore "no employment contract [existed] between the parties" and Defendants are entitled to summary judgment on Plaintiff's breach of the implied covenant of good faith and fair dealing claim. *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 289 (3d Cir. 2010) (affirming district court's granting of summary judgment on plaintiff's breach of implied covenant of good faith and fair dealing claim where the plaintiff was an at-will employee).

The Court therefore dismisses Count Three of the TAC.

### *3. Negligence*

Defendants argue that Plaintiff's negligence claim is barred by the New Jersey Workers' Compensation Act (the "NJWCA"). (Defs.' Moving Br. 46-47.) New Jersey courts have held that "negligence claims are subsumed by the scheme set up by the [NJWCA]." *Powell v. Verizon*, No. 19-8418, 2019 WL 4597575, at *12 (D.N.J. Sep. 20, 2019) (citations omitted). An employee "cannot sustain a claim against [his] former employer for neglige[nce]" because all such actions are barred by the NJWCA. *Mardini v. Viking Freight, Inc.*, 92 F. Supp. 2d 378, 386 (D.N.J. 1999); *see also Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 507 (N.J. 1985) (characterizing the NJWCA as an "exclusive remedy"). The NJWCA, accordingly, "provides the sole remedy under which a plaintiff may seek a remedy for negligent conduct by an employer[.]" *Piantadosi v. Pub. Serv. Elec. & Gas* Co., No. A-2778-08T3, 2011 WL 3177318, at *14 (N.J. Super. Ct. App. Div. July 28, 2011) (citing *Smith v. Exxon Mobil Corp.*, 374 F. Supp. 2d 406, 424 (D.N.J. 2005)); *see also Gaines v. United Parcel Serv., Inc.*, No. 13-3709, 2014 WL 1450113, at *7 (D.N.J. Apr. 14, 2014) (dismissing claim for negligence/breach of ordinary care because NJWCA is the exclusive remedy). This is true regardless of the kind of injury alleged, including employment related injuries. *See, e.g.*, *Ruggiero v. Eli Lilly & Co.*, No. 19-16206, 2022 WL 17082498, at *8

(D.N.J. Nov. 18, 2022) (granting summary judgment on plaintiff's negligent hiring and supervision and training claims because they were barred by the NJWCA); *Cong Su v. David's Cookies*, No. A-1121-08T1, 2009 WL 2426336, at *3 (N.J. Super. Ct. App. Div. Aug. 10, 2009) (employee's claims of "failure to train, failure to supervise, [and] failure to warn" "clearly" fall within the province of the NJWCA); *Cremen v. Harrah's Marina Hotel Casino*, 680 F. Supp. 150, 155-56 (D.N.J. 1988) (explaining that plaintiff's allegation of negligent hiring and retention was barred by the exclusive remedy provision of the NJWCA); *Silvestre v. Bell Atl. Corp.*, 973 F. Supp. 475, 486 (D.N.J. 1997) (finding that "an employee cannot . . . assert negligent hiring and supervision against an employer" where the underlying injury was based in discrimination), *aff'd*, 156 F.3d 1225 (3d Cir. 1998).

Here, Plaintiff argues that summary judgment is not appropriate because his claim is not premised on a "physical injury" but rather a theory of negligence asserted as a matter of law and contract. (Pl.'s Opp'n Br. 20-21.) The NJWCA, however, preempts negligence actions against employers even in situations where the employee is not asserting a physical injury. *See, e.g.*, *Gaines*, 2014 WL 1450113, at *7 (dismissing plaintiff's claim that the defendant employer "negligently, unlawfully, recklessly, and improperly investigated . . . Plaintiff's charges of discrimination" because it was "preempted by the exclusive remedy provision of the [NJWCA]"); *Kennedy v. Envoy Airlines Inc.*, No. 15-8058, 2018 WL 895871, at *4 (D.N.J. Feb. 14, 2018) (denying plaintiff's motion to amend to add a "negligent testing" claim to his complaint because such a "negligence claim against his employer [was] preempted by the [NJWCA]"), *aff'd sub nom.*, *Kennedy v. Am. Airlines Inc.*, 760 F. App'x 136 (3d Cir. 2019); *Jackson v. T & N Van Serv.*, No. 99-1267, 2000 WL 562741, at *10 (E.D. Pa. May 9, 2000) (granting summary judgment in discrimination case on plaintiff's negligent supervision claim because plaintiff as "an employee

suing . . . his employer" could not bring a "cause of action based on negligence . . . due to the exclusive remedy provision of the [NJWCA]" (citation omitted)).

Because the NJWCA preempts Plaintiff's negligence claim, summary judgment in Defendants' favor is appropriate here. The Court therefore dismisses Count Eight of the TAC.

### C. Wrongful Denial of Severance Benefits Under ERISA—Count Ten

Defendants argue that they are entitled to summary judgment in their favor on Count Ten of the TAC because Plaintiff: (1) failed to exhaust his administrative remedies; and (2) is not entitled to plan benefits. (Defs.' Moving Br. 32-40.) Specifically, Defendants contend that Plaintiff "never made a written request for benefits to the Plan Administrator or anyone else at Teva and its affiliates[,]" and that Plaintiff, therefore, never initiated "the appeals process for the alleged wrongful denial of those benefits." (*Id.* at 33-34.) Plaintiff argues that pursuing administrative remedies has been and will continue to be futile because Teva continues to contest whether the termination of Plaintiff was lawful. (Pl.'s Opp'n Br. 16.) Plaintiff, moreover, contends that correspondence his attorney sent to Teva "demanding all entitlements . . . be paid, including but not limited to, any compensation due, [or] benefits payable," was "rejected" which was "a denial under" the Plan. (*Id.* at 17; *see also* Ex. D. to Pl.'s Opp'n Br. 3 ("Correspondence"), ECF No. 27-2.)

An employee who participates in a plan governed by ERISA may bring an action under the Act to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(l)(B). Before seeking to enforce terms of an ERISA plan in federal court, however, a party must either exhaust its administrative remedies or establish that it need not have exhausted its administrative remedies because "it would be futile to do so." *Harrow v. Prudential Ins. Co. of*

*Am.*, 279 F.3d 244, 249 (3d Cir. 2002) (citing *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990)), *aff'd*, 725 F. App'x 102 (3d Cir. 2018); *Krauter v. Siemens Corp.*, No. 16-2015, 2017 WL 979093, at *4 (D.N.J. Mar. 13, 2017). The Third Circuit has explained that "[c]ourts require exhaustion of administrative remedies 'to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.'" *Harrow*, 279 F.3d at 249 (citation omitted). Plaintiffs attempting to invoke the futility exception to the exhaustion requirement must "provide a clear and positive showing of futility." *Id.* (citation modified) (citations omitted).

Courts determining "[w]hether to excuse exhaustion on futility grounds" must weigh several factors, including: "(1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances; (3) existence of a fixed policy denying benefits; (4) failure of the . . . company to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile." *Id.* at 250.

Here, the Plan provides that "employees separated from employment for 'misconduct, violation of company policies, procedures, practices or Ethics and Code of Conduct' are ineligible to receive Plan benefits." (SOF ¶ 114 (quoting Plan 1); RSOF ¶ 114 (admitting that "the Plan speaks for itself[]").) Conversely, employees are able to receive Plan benefits in the following circumstances:

> [(1)] [e]limination of position; [(2)] [m]aterial change in job responsibilities that, for example, requires a significant change in skill requirements, or bona fide occupational qualifications or results in a reduction in Global Grade greater than one; [(3)] [r]eduction in force; or [(4)] [o]ther instances, in Teva's discretion, as determined by the individual situation.

(Plan 1.) The Plan explains that participants "must use and exhaust the Plan's administrative claims and appeals procedure before bringing suit in either state or federal court[,]" and that "failure to follow the Plan's prescribed procedures in a timely manner may . . . cause you to lose your right to sue regarding an adverse determination." (*Id.* at 6.) To request benefits, a participant's request should "be in writing and . . . be made to the Plan Administrator." (*Id.* at 5.) The Plan explains the appeals process in which an employee may appeal a denied claim by "fil[ing] a written appeal" and "submit[ting] written comments, documents, records, and other information relating to your claim in appeal[.]" (SOF ¶ 123 (quoting Plan 5); RSOF ¶ 123.)

Here, Plaintiff does not argue that he attempted to exhaust his administrative remedies and argues only that "any pursuit of administrative remedies ha[s] been and will continue to be futile." (Pl.'s Opp'n Br. 16.) In making this argument, Plaintiff does not cite *any* factual evidence other than the correspondence that his counsel wrote discussed above. (*See id.* at 16-18 (citing COF ¶ 51 (describing the correspondence)); RCOF ¶ 51 ("Defendants admit that . . . [Plaintiff's] legal counsel sent correspondence to Teva's in-house counsel[.]").)

The Court finds that Plaintiff has not made a clear and positive showing of futility. As to the first futility factor, the only evidence that Plaintiff puts forth to argue that he attempted to pursue administrative relief was correspondence that his attorney sent to Teva "demanding all entitlements . . . be paid, including but not limited to, any compensation due, [or] benefits payable[.]" (Pl.'s Opp'n Br. 17 (citing RCOF ¶ 51).) This request, he contends, "was rejected" which, he submits, constitutes "a denial under the [Plan.]" (*Id.*) The terms of the Plan require that the written request be made to the Plan Administrator, describe the appeals process, and explicitly note that Plan participants must exhaust the appeals process before filing suit. (*See* Plan 1, 5-6.) Because it is undisputed that Plaintiff did not attempt to exhaust the appeals process, this factor

weighs against a finding of futility. *Marc Cooper, DDS v. All. Oral Surgery, LLC*, No. 13-1126, 2013 WL 5724513, at *3 (D.N.J. Oct. 21, 2013) (finding plaintiff failed to satisfy first futility factor where he merely sent correspondence "*before* the first notice of adverse determination[]" (emphasis in original)), *aff'd sub nom.*, *Cooper v. All. Oral Surgery, LLC*, 586 F. App'x 100, 102 (3d Cir. 2014).

As to the second factor, Plaintiff filed the TAC first raising his ERISA claim, which was not included in his original complaint, more than two years after his termination. (TAC ¶¶ 86-92.) The Court finds that this factor weighs slightly against a finding of futility. *Stampone v. Walker*, No. 15-6956, 2023 WL 2263596, at *7 (D.N.J. Feb. 28, 2023) (explaining that "plaintiffs d[o] not act reasonably in seeking immediate judicial review" where they do "not pursue any kind of relief[] outside of the instant action[]" (citation omitted)). As to the third futility factor, Plaintiff "failed to set forth [any] evidence that the policy of denial was *fixed* such that the appeal would be automatically denied." *Marc Cooper, DDS*, 2013 WL 5724513, at *3 (emphasis in original). This factor therefore weighs against a finding of futility. *See id.* As to the fourth futility factor, Plaintiff points to nothing in the record evidencing that Defendants or Plan Administrators failed to comply with their own policies in denying his claim. (*See generally* COF; RCOF; Pl.'s Opp'n Br.) This factor, accordingly, weighs against a finding of futility. As to the fifth factor, Plaintiff has presented no testimony of plan administrators noting that administrative appeal would be futile. (*See generally* COF; RCOF; Pl.'s Opp'n Br.) This factor, accordingly, weighs against a finding of futility. *Marc Cooper, DDS*, 2013 WL 5724513, at *3 (finding no futility where, among other things, plaintiff "provided no statement from a plan administrator indicating that an appeal would be futile"). The only action that Plaintiff points to taking is the broad correspondence that his attorney sent to Teva's in-house counsel and in that correspondence only broadly claimed that

Plaintiff's termination "resulted in significant repercussions" including "the loss of benefits[.]" (Correspondence 3.)

Moreover, as discussed above, all five factors weigh against a finding of futility and there is no dispute that Plaintiff failed to exhaust his administrative remedies as required by ERISA. *Marc Cooper, DDS*, 2013 WL 5724513, at *3 (granting summary judgment on plaintiff's ERISA claim where plaintiff failed to exhaust his administrative remedies and satisfy the futility factors); *see also Davis*, 2016 WL 1078166, at *2 (explaining that where "the nonmoving party fails to make a sufficient showing on any essential element of its case, the moving party is entitled to judgment as a matter of law" (citation omitted)); *Harrow*, 279 F.3d at 249 (noting that plaintiffs attempting to invoke the futility exception to the exhaustion requirement must "provide a clear and positive showing of futility" (citation modified) (citations omitted)).

The Court therefore dismisses Count Ten of the TAC.

**D. Reverse-Veil Piercing and Alter Ego Liability Claim—Count Nine**

Defendants argue that they are entitled to summary judgment on Count Nine because: (1) substantive reverse-veil piercing and alter ego liability claims are non-cognizable generally under New Jersey law; and (2) there is no evidence to support such liability in this case. (Defs.' Moving Br. 7-13.) In opposition, Plaintiff argues that issues of fact remain on his reverse-veil piercing claims because he "has identified Anda employees as witnesses with knowledge of the allegations and communications" at issue here, and "Teva itself relies on the actions of Anda personnel . . . and shared [human relations] functions in explaining the events leading to [Plaintiff's] termination." (Pl.'s Opp'n Br. 22.)

### *1. New Jersey does not Recognize Reverse Veil Piercing*

Under New Jersey law, courts "begin with the fundamental propositions that a corporation is a separate entity from its shareholders . . . and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State, Dep't of Env't Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983) (citations omitted); *see also Lyon v. Barrett*, 445 A.2d 1153, 1156 (N.J. 1982). A court can "ignore a corporation's separate entity in order to prevent it 'from being used to defeat the ends of justice, to perpetuate fraud, to accomplish a crime, or otherwise evade the law.'" *Rowen Petroleum Props., LLC v. Hollywood Tanning Sys., Inc.*, 899 F. Supp. 2d 303, 308 (D.N.J. 2012) (quoting *Melikian v. Corradetti*, 791 F.2d 274, 281 (3d Cir. 1986)). "[M]ere ownership of a subsidiary[, however,] does not justify the imposition of liability on the parent." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (citations omitted); *see also Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 513 (3d Cir. 1996) ("Even in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated." (quoting *Ventron*, 468 A.2d at 164)). Ultimately, "liability generally is imposed only when the [dominant corporation] has abused the privilege of incorporation by using the [subservient corporation] to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron*, 468 A.2d at 164 (citation omitted).

To pierce the corporate veil, "a plaintiff must show that: (1) one corporation is organized and operated as to make it a mere instrumentality of another corporation[;] and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Bd. of Tr. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (citation omitted). Piercing the corporate veil can occur in a traditional manner or in reverse. *See In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999) (citation omitted).

"Reverse corporate veil piercing occurs . . . when a plaintiff seeks to hold a subsidiary liable for the [actions] of its parent company." *In re G-I Holdings, Inc.*, 313 B.R. 612, 656 n.36 (Bankr. D.N.J. 2004).

Defendants, however, are correct that there is no New Jersey case that recognizes reverse veil piercing as a cognizable claim. *See, e.g.*, *Repetti v. Vitale*, No. A-424-10T2, 2011 WL 3962518, at *5 (N.J. Super. Ct. App. Div. Sep. 9, 2011) ("We have located no case employing [a reverse corporate veil piercing] remedy in New Jersey."); *Russo v. Creations By Stefano, Inc.*, No. A-663-18T1, 2020 WL 4873188, at *6 n.10 (N.J. Super. Ct. App. Div. Aug. 20, 2020) ("[W]e are aware of no published case recognizing reverse veil piercing under New Jersey law."); *SASCO 1997 NI, LLC v. Zudkewich*, No. A-2083-05T2, 2007 WL 1827257, at *19 (N.J. Super. Ct. App. Div. June 27, 2007) ("Our research has not disclosed a New Jersey case permitting the reverse piercing of the corporate veil.").

Moreover, the only argument that Plaintiff makes in opposition to Defendants' argument that reverse-veil piercing claims are non-cognizable under New Jersey law, is his contention that "New Jersey District Courts have recognized its application under New Jersey law." (Pl.'s Opp'n Br. 22 (citing *Hunt Const. Grp., Inc. v. Farina*, No. 11-4933, 2012 WL 72286, at *3 (D.N.J. Jan. 10, 2012)). Plaintiff cites just one case to support this proposition: *Hunt*, 2012 WL 72286. (*Id.*) The portion of *Hunt* that Plaintiff cites, however, itself cites to *Repetti*, 2011 WL 3962518, which generally states the elements of corporate veil piercing before explaining that "[i]n a reverse piercing-the-corporate-veil context, assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate entity and the individual will be considered one and the same." *Repetti*, 2011 WL 3962518, at *5 (citation modified) (citation omitted). The *very next sentence* in *Repetti* states that the court "ha[s] located no case employing this remedy in New

Jersey." *Id. Repetti*, moreover, was decided on appeal of both the trial court's order granting judgment in favor of defendants and dismissing, among other things, plaintiff's reverse veil piercing claim, and the trial court's order denying reconsideration of the same. *Id.* at *1-2. Importantly, the *Repetti* court affirmed the trial court's decision. *Id.* at *7. The *Repetti* court's opinion also quoted the trial court's decision, which explained that plaintiff's veil-piercing "claim must fail[] insofar as what plaintiff seeks is actually reverse veil-piercing, which [is a] remedy [that] has never been authorized in New Jersey." *Id.* at *3. Furthermore, the quote from *Repetti* that the *Hunt* court cites quotes a passage from *In re Blatstein* that generally explains what reverse corporate veil piercing is. *See Hunt*, 2012 WL 72286, at *3 (quoting *Repetti*, 2011 WL 3962518, at *5 (quoting *In re Blatstein,* 192 F.3d at 100)). The quote from *In re Blatstein*, however, discusses Pennsylvania law—not New Jersey law. *See In re Blatstein*, 192 F.3d at 100 (explaining that "Pennsylvania law [which is] applicable here[] recognizes a strong presumption against piercing the corporate veil" and noting the difference between "classical piercing" and "reverse piercing" (citation modified)). This Court's independent research has also turned up no New Jersey cases recognizing reverse veil piercing as a remedy under New Jersey law. Furthermore, the majority of the New Jersey District Court cases that have mentioned reverse veil piercing cite the passage from *Hunt* discussed above for the explanation of the difference between traditional veil piercing and reverse veil piercing. *See, e.g.*, *Vaswani, Inc. v. Atl. Enters. Ltd*, No. 22-137, 2023 WL 4740905, at *5-6 (D.N.J. July 25, 2023) (citing *Hunt* and dismissing veil piercing claims); *Bowers v. Taylor*,

No. 23-4222, 2024 WL 3541878, at *5 (D.N.J. June 28, 2024)[6] (citing *Hunt*), *R. & R. adopted*, No. 23-4222, 2024 WL 3540414 (D.N.J. July 25, 2024).

Because New Jersey does not recognize reverse veil piercing, *see, e.g.*, *Repetti*, 2011 WL 3962518, at *5 ("We have located no case employing [a reverse corporate veil piercing] remedy in New Jersey."); *Russo*, 2020 WL 4873188, at *6 n.10 ("[W]e are aware of no published case recognizing reverse veil piercing under New Jersey law."), Defendants are entitled to summary judgment, and the Court dismisses Count Nine of the TAC.

### 2. *Even if New Jersey Recognized Reverse Veil Piercing, however, there is no Evidence to Support Such a Claim Here*

To satisfy the first element of corporate veil piercing, "a plaintiff must [establish] that the parent 'completely dominate[s] the finances, policy, and business practice with respect to the subject transaction' to such a degree that the subsidiary has 'no separate mind, will, or existence of its own.'" *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 507 (D.N.J. 2009) (second alteration in original) (quoting *Craig v. Lake Asbestos of Que., Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988)). A plaintiff must also establish "such dominion or control was exercised to a substantial degree." *See Marketvision/Gateway Rsch., Inc. v. Priority Pay Payroll, LLC*, No. 10-1537, 2011 WL 1640459, at *4 (D.N.J. Apr. 29, 2011) (citing *Craig*, 843 F.2d at 150). The Third Circuit provides several non-binding factors relevant to the inquiry of whether the parent company completely dominates a subsidiary, including:

> gross undercapitalization[,] . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor

[6] The Court notes that *Bowers* is the single case the Court has located in which a New Jersey District Court permitted a reverse-veil piercing claim. *Id.* at *6. As explained above, however, the court in *Bowers* cited the passage discussed above in *Hunt* which, in turn, cited the passage discussed above in *Repetti*. *Id.* at *5. The facts in *Bowers*, moreover, were distinguishable from the facts here. In *Bowers*, which was decided on a motion for default judgment, plaintiffs alleged that the single member of an LLC misused loan proceeds "to advance his own personal interests, to insulate him [from] personal debts and obligations, and to frustrate and defeat his creditors." *Id.*

> corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and . . . [whether] the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Holzli v. DeLuca Enters.*, No. 11-6148, 2012 WL 983693, at *2 (D.N.J. Mar. 21, 2012) (second, third, and fourth alterations in original) (quoting *Craig*, 843 F.2d at 150); *Ramirez*, 644 F. Supp. 2d at 507. "The identical factors and analysis apply to traditional and reverse veil-piercing claims." *Bowers*, 2024 WL 3541878, at *5 (quoting *Vaswani*, 2023 WL 4740905, at *5).

To satisfy the second element, "a plaintiff . . . [must] demonstrate that the defendants, via the corporate form, perpetrated a fraud, injustice, or the like[.]" *Holzli*, 2012 WL 983693, at *2 (citing *Chen v. HD Dimension, Corp.*, No. 10-863, 2010 WL 4721514, at *4 (D.N.J. Nov. 15, 2010)). "'[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving' such fraud or injustice." *Biviano v. Avella*, No. A-1778-15T4, 2018 WL 2207977, at *8 (N.J. Super. Ct. App. Div. May 15, 2018) (alteration in original) (quoting *Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 877 (N.J. 2008)).

Here there is a factual dispute as to whether Teva (the parent company) has been dominated by Anda (the subsidiary), or vice versa, sufficient to meet the first element. (*See* COF ¶ 53 (explaining that Wilson testified that Teva and Anda are under the same "umbrella"); RCOF ¶ 53 ("Denied."); COF ¶ 54 (explaining that Benitez testified that "Teva and subsidiaries could be considered one and the same" because they are "wholly owned subsidiaries of Teva"); RCOF ¶ 54 ("Denied as stated.").) The Court notes however, that there is no evidence in the record that Teva or Anda were grossly undercapitalized, did not pay dividends, were insolvent, were siphoning funds from one another, had non-functioning officers or directors, did not have corporate records, or were merely a facade for the operations of the other. (*See generally* COF; RCOF; SOF; RSOF.)

As to the second element, there is no dispute that there is no evidence in the record to indicate that Defendants perpetrated a fraud, injustice, or the like. Plaintiff has provided no evidence to show that either Anda or Teva has "been used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law" as evidenced by the Court's discussion of the merits of Plaintiff's other claims above. *See Biviano*, 2018 WL 2207977, at *8 (explaining that "the party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving such fraud or injustice" (citation modified) (citation omitted)). Plaintiff merely argues in conclusory fashion in his opposition brief that "[t]he wrongdoing detailed herein was done by both Teva and Anda, by abusing both Anda and Teva's own joint policies, and carried out by representatives of both companies. The corporate form has been entirely disregarded." (Pl.'s Opp'n Br. 26; *see generally* COF; RSOF); *see also Morgan*, 2026 WL 710003, at *9 (explaining that "unsupported assertions, speculation, or conclusory allegations cannot defeat summary judgment" (citing *Longstreet*, 67 F. App'x at 126)). There is therefore no dispute, and Plaintiff has failed to meet his burden sufficient to satisfy the second element because he does not cite to or produce anything in the record to support such a proposition. (*See* Pl.'s Opp'n Br. 26; *see generally* COF; RSOF); *e.g.*, *Witter v. Sterlingbrook Equine, Inc.*, No. 19-14799, 2022 WL 1471248, at *2 (D.N.J. May 10, 2022) (explaining that where "the non-moving party bears the burden of proof at trial, the movant may discharge its burden by pointing to an absence of evidence necessary to support the non-movant's claim" and that "the burden of persuasion . . . rests on the non-moving party to establish each element necessary to succeed on the claims on which it bears the burden of proof at trial").

Moreover, although Anda employees Reyes, Nelson, Wilson, and Dudick were involved in making and processing complaints about Plaintiff after the HDA Conference (SOF ¶¶ 64-65, 67,

69-72, 101; RSOF ¶¶ 64-65, 67, 69-72, 101), Benitez, an employee of TSM—not Anda, led the OBI investigation process and Lawlor, another Teva employee, made the termination decision independent of Anda or Anda employees (*see* SOF ¶ 94 ("Benitez and Lawlor concluded that [Plaintiff's] termination was appropriate[.]"); *see* RSOF ¶ 94 (not denying that Benitez and Lawlor concluded that Plaintiff's termination was appropriate but denying that other complaints against him were substantiated); SOF ¶ 98 ("Lawlor ultimately made the decision to terminate [Plaintiff's] employment with Teva"); RSOF ¶ 98 ("Admit.")). There is therefore no dispute that Benitez, a TSM employee, and Lawlor, a Teva employee, were responsible for Plaintiff's termination, independent of Anda. (SOF ¶¶ 94, 98; RSOF ¶¶ 94, 98.) Plaintiff, accordingly, failed to meet his burden on the second element to establish the "extraordinary circumstances" required to warrant piercing the corporate veil of both Defendants here. *See EJK Realty LLC v. AKR Contracting, Inc.*, No. A-1723-22, 2024 WL 4778708, at *7 (N.J. Super. Ct. App. Div. Nov. 14, 2024) (affirming summary judgment in favor of defendant on plaintiffs' veil-piercing claim because plaintiffs failed to "meet their . . . burden of demonstrating facts to warrant piercing the corporate veil" and noting that "[t]he purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law[]"); *David's Warehouse Sales, Inc. v. A&H Home Style, Inc.*, No. A-4355-12T2, 2014 WL 8883197, at *4 (N.J. Super. Ct. App. Div. May 27, 2015) (reversing veil-piercing judgment where the "evidence presented . . . fail[ed] to show any misuse of the corporation"); *see also Perotti v. United States*, No. 12-1860, 2016 WL 1023367, at *2 (M.D. Pa. Mar. 15, 2016) (explaining that "[o]nce the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party . . . must . . . designate specific facts showing that there is a genuine [dispute] for trial" and noting that

"[s]ummary judgment should be granted where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial" (citation modified)), *aff'd*, 664 F. App'x 141 (3d Cir. 2016).

The Court therefore dismisses Count Nine of the TAC.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. The Court will issue an order consistent with this Memorandum Opinion.

MA Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

DATED: JUNE 29th, 2026